UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PAUL ANTHONY BRYANT,<br><br>   Defendant. | Case No.25-mj-173 |

### EMERGENCY MOTION TO STAY DEFENDANT'S RELEASE
### AND *DE NOVO* REVIEW OF MAGISTRATE JUDGE'S RELEASE ORDER

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, seeks this Court's review of the release order by the Honorable Magistrate Judge Zia M. Faruqui issued on August 28, 2025. Specifically, the United States requests the Court: (i) stay Magistrate Judge Faruqui's order releasing the Defendant; and (ii) grant a *de novo* review of Magistrate Judge Faruqui's denial of the United States's motion for pre-trial detention pursuant to 18 U.S.C. § 3142(f)(1)(A) (Crime of Violence). The Court has the authority to grant a stay to consider this emergency *de novo* review of the Magistrate Judge's order of release.

### BACKGROUND

On August 24, 2025, at approximately 11:00 PM, Metropolitan Police Department ("MPD") Officer Adam Smith, Badge # 3757, was on patrol in the 1500 block of 14th Street NW in the District of Columbia. Officer Smith was flagged down by several members of the Ohio and Delaware National Guard, who were conducting patrols in the area as part of an August 11, 2025, Executive Order, "Declaring a Crime Emergency in the District of Columbia." The members of the National Guard were employees of the United States and federal law enforcement officers.

They were dressed in their uniforms and acting in performance of their official duties at the time of the offense.

The National Guard members told Officer Smith that an individual, later identified as Paul Anthony Bryant (hereinafter, "the Defendant"), threatened and physically assaulted National Guard members. Based on the information from the National Guard members, a "lookout" for the Defendant's description was broadcast over the MPD radio network.

Officer Smith spoke with several members of the National Guard, including N.T., D.C., and D.S. Those National Guard members stated that the Defendant approached them in the vicinity of 1615 14th Street NW, and made statements to them, including: "These are our streets"; "I'll kill you"; and words to the effect that the Defendant was "strapped." National Guard members understood "strapped" to mean that the Defendant was armed, and National Guard members feared for their safety.

Officer Smith also spoke with National Guard member P.M., who stated that the Defendant approached P.M. and C.T. in front of 1541 14th Street NW. National Guard member P.M. told Officer Smith that the Defendant threw his left shoulder into P.M.'s left shoulder, making physical contact.

Based on the lookout, MPD Officers located and stopped the Defendant at approximately 12:30 AM in the 1500 block of 12th Street NW, Washington, DC. MPD Officers discovered an unholstered handgun in the rear of the Defendant's waistband. National Guard members P.M. and C.T. positively identified the Defendant to MPD officers as the individual who made physical contact with National Guard member P.M.

While handcuffed, the Defendant repeatedly yelled derogatory names and racial slurs at the MPD officers. At one point, the Defendant told officers that if they went to SE in Washington, DC, someone who was "not as civilized as [the Defendant]" would shoot them in the head. The Defendant that he would "look at that and say he deserved it."

Officers conducted a check of firearms records and learned that the handgun was legally registered to the Defendant in the District of Columbia and that the Defendant had a valid concealed carry permit for the firearm. The firearm was identified as a Glock Model 47 handgun, with serial number CFBC2901 and was loaded with one 9mm round in the chamber. At the time it was recovered, the firearm appeared to be fully functional, designed to expel a projectile by the action of an explosive, designed to be fired with one hand, and had a barrel length of less than 12 inches.



*Figure 1 - The firearm recovered from the Defendant's person, circled in red.*

While in custody, the Defendant spontaneously stated that the magazine from the firearm was located inside his vehicle. The officers located the Defendant's vehicle across from 1734 14th Street NW. A gun-detection dog was brought to the Defendant's vehicle and indicated a positive hit. A search of the vehicle was conducted, during which a ten-round ammunition magazine, with five 9mm rounds in the magazine, was located. This magazine was compatible with the firearm recovered from the Defendant's waistband. Additionally, a black Tokarev Bullpump twelve-gauge shotgun was recovered from the vehicle.



*Figure 2 – the shotgun recovered from the Defendant's vehicle.*

## PROCEDURAL HISTORY

On August 26, 2025, the United States filed a complaint charging the Defendant with 18 U.S.C. § 111(a)(1) Assaulting, Resisting, or Impeding Certain Officers or Employees, 18 U.S.C. § 115(a)(1)(B) Influencing, impeding, or retaliating against a federal official by threatening, and

DC Code § 22-1810, Threatening to kidnap or injure a person. On August 27, 2025, an initial appearance was held before the Honorable Magistrate Judge G. Michael Harvey. On August 28, 2025, a detention hearing was held before the Honorable Magistrate Judge Zia M. Faruqui at which time the Government requested that the Defendant be detained pending trial. Magistrate Judge Faruqui denied the Government's request ordering that the Defendant be released.

## ARGUMENT

### I. This Court Has the Authority to Grant the Motion to Stay Release Pending a *De Novo* Review

The power to stay an order of release is directly related to a district court's authority to review a release order of a magistrate judge. *See, e.g.*, *United States v. Brigham*, 569 F.3d 220, 230 (5th Cir. 2009) ("given that the issue being reviewed involves a person's release from custody pending further legal proceedings, the absence of stay authority could render the district court's review power illusory."). An alternative interpretation would risk allowing the charged defendant the opportunity to "harm[] the community or disappear[] by the time the district court's ruling is rendered and detention is ordered" if the district court determines to order the defendant detained. *Id.*; *see also United States v. Salazar-Andujo*, 599 F. Supp. 3d 491, 494 (W.D. Tex. 2022); *United States v. Rosales-Villegas*, No. 23-CR-00044, 2023 U.S. Dist. LEXIS 59776, at *5-6, 7 n.1 (D. Nev. Apr. 4, 2023) ("The Court's decision is also based on unanimous caselaw. As the Government notes, 'stays of release are so commonplace and uncontroversial that they are often relegated to a sentence or two in the procedural history of an opinion on the merits of the detention decision.' (Resp. 3:9-24) (collecting cases). Here, the Court is guided by the practical considerations underlying the issuance of a stay as well as caselaw within the Ninth Circuit routinely authorizing stays.").

The United States is aware of the Honorable Magistrate Judge Zia M. Faruqui's recent

decision denying a motion to stay in *United States v. Abass*, 25-CR-00079 (TSC), ECF No. 12 (April 11, 2025). Judge Faruqui indicated that although magistrate courts typically suspend an order of release pending the United States's request for *de novo* review of the Magistrate Judge's release order, the Court would no longer do so under the four factors articulated in *Nken v. Holder*, 556 U.S. 418 (2009). The United States, however, is not seeking an extraordinary length of time in which to have the Court consider the merits of a stay which will require significant, detailed briefing, but rather, an emergency stay to present the merits of the requested detention to the district court judge.

Thus, the United States seeks a brief administrative stay of the order of release, and as such, the request should not be analyzed under the *Nken* factors. As this Circuit has noted, "[t]he purpose of [this] administrative stay is to give the court sufficient opportunity to consider the merits of the motion for a stay pending appeal." *Cobell v. Norton*, No. 03-5262, 2004 WL 603456, at *1 (D.C. Cir. Mar. 24, 2004). Such a stay, as the Supreme Court noted recently in *United States v. Texas*, 144 S. Ct. 797, 798 (2024), "buys the court time to deliberate" and does not "typically reflect the court's consideration of the merits." *Id.* at 798 (Barret, J., concurring). District courts have recognized that administrative stays are also applicable in seeking emergency relief, including in the District of Columbia. *See, e.g.*, *Dellinger v. Bessent*, 2025 WL 450488 (D.D.C. Feb. 10, 2025); *National Council of Nonprofits v. Office of Management & Budget*, 2025 WL 314433 (D.D.C. Jan. 28, 2025); *Order, Texas v. Department of Homeland Security*, No. 24-CV-306 (E.D. Tex. Aug. 26, 2024). As these courts have recognized, "[t]he authority for an administrative stay arises from the All Writs Act and a court's inherent authority to manage its docket." *Dellinger*, 2025 WL 450488 (quoting *Order, Texas,* No. 24-CV-306, at 2).

## II.   *De Novo* Review of the Magistrate's Release Order

As an initial matter, a defendant must be detained pending trial, if the Court determines that no condition or combination of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(f)(1). The United States must establish by clear and convincing evidence that a defendant is a danger to the community. *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988). In contrast, "[a] determination that an individual is a flight risk must be supported by a preponderance of the evidence." *United States v. Vasquez-Benitez*, 919 F.3d 546, 551 (D.C. Cir. 2019).

Further, 18 U.S.C. § 3145(a) states:

**(a) Review of a release order** – If a person is ordered released by a magistrate, …

> (1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release . . .

The motion shall be determined promptly.

On the United States's motion to review a release order, this Court considers *de novo* the magistrate judge's denial of pre-trial detention. In its discretion, the Court may proceed to rehear the evidence by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument. It may take additional evidence from new witnesses or consider arguments not previously raised.

In short, the Court may proceed as best enables it to resolve the question posed: whether any condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. As the legislative history of the 1984 Bail Reform Act amendments shows:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving violence. . . .

*See* S. Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3195-3196.

There are four factors under Section 3142(g) that the Court should consider and weigh in determining whether to detain a defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g). In consideration of these factors, the United States respectfully submits that there is no condition, or combination of conditions, that would assure the safety of the community or the Defendant's appearance at future proceedings.

### A. Nature and Circumstances of the Offense Charged

The first factor to be considered, the nature and circumstances of the offense charged, weighs in favor of detention. 18 U.S.C. § 115(a)(1)(B) is a crime of violence which punishes whoever "threatens to assault, kidnap, or murder, a United States official, a United States judge, a Federal law enforcement officer or an official whose killing would be a crime under such section." As relevant here, the elements clause of 18 U.S.C. § 3156 (which is incorporated into 18 U.S.C. § 3142) defines a crime of violence as "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another." A threat to murder under 18 U.S.C. § 115(a)(1)(B) clearly threatens a "use of physical force against the person . . . of another" under the elements clause. Numerous courts have found that this offense

satisfies the elements clause. *See United States v. Chrestman*, 525 F. Supp. 3d 14, 28 (D.D.C. 2021) ("Threatening to Assault a Federal Law Enforcement Officer in violation of 18 U.S.C. § 115(a)(1)(B), poses an inherent risk of danger to the community as a 'crime of violence' within the meaning of § 3142(g)"). In *United States v. Crawford*, No. 20-12309, 2022 WL 17069409 (11th Cir. Nov. 17, 2022), the court noted:

> We turn next to Crawford's challenge to the second predicate crime. It was a 2009 federal conviction for threats to a federal official in violation of 18 U.S.C. § 115(a). According to paragraph 31 of the PSI, Crawford made several telephone calls in 2009 threatening to kill a federal probation officer, an agent of the FBI, and an assistant United Staes attorney. Again, there was no objection to these facts. These facts would seem to fall comfortably within the language of the elements clause of § 4B1.2(a)(1). See Bonner, 85 F.3d at 527. And Crawford cites no binding Eleventh Circuit or Supreme Court cases suggesting otherwise. We readily conclude that there is certainly no plain error.

*Id*. at *5. Also, the Seventh Circuit observed:

> [Defendant's] felony convictions for threatening to murder a magistrate judge and threatening to harm a corrections supervisor are crimes of violence, see *United States v. Ladwig*, 432 F.3d 1001, 1005 (9th Cir. 2005) (holding that a threat to harm another person is a crime of violence); see also U.S.S.G. § 4B1.2(a) (defining "crime of violence" to include any offense having as an element the "threatened use of physical force against the person of another.") which Romero did not dispute at sentencing. Thus, any argument that Romero is not a career offender would be frivolous.

*United States v. Romero*, 291 F. App'x 776, 777 (7th Cir. 2008), see also *United States v. Dean*, 111 F. App'x 762 (5th Cir. 2004) (citing elements clause of Guidelines); Judge Howell's decision in *United States v. Chrestman*, 525 F. Supp. 3d 14, 28 (D.D.C. 2021*); Cf. United States v. Aguirre*, 710 F. App'x 342 (10th Cir. 2018) ("In his reply brief, Mr. Aguirre agrees with the Government that this court need not review an argument that he raised in his opening brief – that his prior conviction for making a threat in violation of 18 U.S.C. § 115(a)(1)(A) is a crime of violence, explaining that he would have the opportunity to present that argument at resentencing on

remand.")[1]

The Defendant's conduct on August 24, 2025, was not a one-off lapse of judgement. The Defendant first encountered two National Guard members in the vicinity of 1615 14th Street NW and made statements to those National Guard members including, "I'll kill you," and that he was "strapped." The Defendant then escalated his conduct by approaching additional National Guard members in front of 1541 14th Street NW, where the Defendant threw his left shoulder into one of the National Guard members left shoulder, making physical contact. Finally, when the Defendant was detained, he continued to yell at MPD officers that if they went to SE in Washington, DC, someone who was "not as civilized as [the Defendant]" would shoot them in the head, and the Defendant would "look at that and say he deserved it." The Defendant's comments on their face indicate a lack of regard for human life and are condoning vigilante justice. There is no reason to believe the Defendant will not act in a similar manner under similar circumstances if released. Additionally, the Defendant had the present ability to carry out these threats given the firearm recovered in his waistband and the shotgun recovered in his vehicle. Therefore, the nature and circumstances of the offense weigh in favor of detention.

### B. Weight of the Evidence Against Defendant

The second factor to be considered, the weight of the evidence, also weighs in favor of detention. The Government's case against Defendant is strong. The Defendant made threats to National Gurad members that he was "strapped" and would kill them. The Defendant's comments

---

[1] *See also United States v. Clark,* 2023 WL 7134928 (N.D. Miss. 2023) at *4; *United States v. Kabbaj*, 2016 WL 11660082 (E.D. Pa. 2016) at *11; United States v. Marseet, 2025 WL 90647 (W.D.N.Y. 2025) at *3 (Defendant charged with threatening two United States judges in violation of 18 U.S.C. § 115(a)(1)(A) and 18 U.S.C. § 115(b)(4) as well as transmitting an interstate threat to murder the two judged and a court clerk in violation of 18 U.S.C. 875(c). (Dkt. No. 22). Each charged offense is a "crime of violence" within the meaning of the Bail Reform Act. (citing cases)).

were corroborated by the fact that the Defendant had an unholstered firearm in his waistband when he was detained by MPD.

The weight of the evidence should be considered equally with the other § 3142 factors. In *United States v. Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." 2023 U.S. Dist. LEXIS 18988, at *29-30. Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). Moreover, the Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). This Court should follow *Blackson* and *Zhang;* this factor should be given no less weight than any other factor.

"If the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *Blackson*, 2023 U.S. Dist. LEXIS 18988, at *29-30. Therefore, the weight and strength of the evidence in the present case increases the likelihood that the Defendant will fail to return to Court and present a danger to the community if released.

### C. History and Characteristics of Defendant

The third factor, the Defendant's history and characteristics, weighs in favor of detention.

While the Defendant does not have any criminal history, that is not the end of the analysis. The escalation of the Defendant's conduct should be extremely concerning to the Court.

The Defendant threatened National Guard members that he would kill them and stated that he was "strapped." While the Defendants threats alone are concerning – and demonstrate his danger to the community – what is even more concerning is the fact that these were not baseless threats. When the Defendant was ultimately detained, he had a unholstered handgun in the rear of his waistband that was loaded with one round in the chamber[2]. The Defendant's firepower was augmented by a shotgun that was recovered in the Defendant's nearby vehicle. Additionally, when the Defendant encountered a separate National Guard member, the Defendant threw his left shoulder into the National Guard member's left shoulder. It should greatly concern this Court that the Defendant's behavior escalated from threats of violence to physical assault in just one additional encounter with National Guard members.

When the Defendant was detained by MPD officers, he continued to yell derogatory names and racial slurs at the officers. At one point, the Defendant stated that someone who was "not as civilized as [the Defendant]" would shoot one of the officers in the head, and the Defendant would "look at that and say he deserved it." Again, the Defendant's comments are particularly concerning when they reference violence enacted by firearms while the Defendant is in possession of a firearm.

The Defendant's behavior at his Initial Appearance on August 27, 2025, should also give this Court serious concern about the Defendant's ability to follow court orders. During his Initial Appearance, the Defendant asked to address the Court and called Magistrate Juge Harvey's decisions "disgusting." It is clear that the Defendant does not respect the Court and will likely not respect any conditions the Court imposes on the Defendant if released.

---

[2] The both the pistol recovered in the Defendant's waistband and the shotgun recovered in the Defendant's vehicle were registered to the Defendant in the District of Columbia, and the Defendant had a valid concealed carry permit.

**D. Danger to the Community**

The fourth and final factor, the danger to any person or the community posed by Defendant's release, similarly weighs in favor of detention. The Defendant's behavior toward *multiple* members of law enforcement shows his danger to the community. In one night, the Defendant told National Guard members he would kill them, physically assaulted another National Guard member, and told MPD officers that they deserved to be shot in the head – all while being detained with a firearm on his person and having a shotgun in his vehicle.

The Defendant clearly has an intense disdain for law enforcement that he expresses through violent behavior. That should give this Court serious pause about the safety of law enforcement – as well as other members of the community who do not share the Defendant's views – if the Defendant is released. Therefore, this factor weighs in favor of detention.

## **CONCLUSION**

The Defendant is eligible for pretrial detention pursuant to [cite section]. All four of the Bail Reform Act factors weigh in favor of pretrial detention. For these reasons, the United States respectfully requests that: (i) the Defendant be detained pending trial; (ii) a hearing be set as soon as practicable; and (iii) Judge Faruqui's release order be stayed pending this Court's review.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:   /s/ *Jessica Bove*
JESSICA BOVE
PA Bar # 328892
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7566
Jessica.Bove@usdoj.gov